IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LINDA KETTERMAN,           )
            Plaintiff,       )
                           )
      vs.                       )     Civil Action No. 08-1542
                           )     Judge Terrence F. McVerry
AFFILIATES LONG TERM DISABILITY   )     Magistrate Judge Robert C. Mitchell
PLAN,                      )
            Defendant.       )

REPORT AND RECOMMENDATION

I.     Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of the defendant (Docket No. 24) be granted.  It is further recommended that the motion

for summary judgment submitted on behalf of the plaintiff (Docket No. 28) be denied.

II.    Report

Plaintiff, Linda Ketterman, brings this action against Defendant,[1] Affiliates Long Term

Disability Plan ("the Plan"), asserting a claim under the Employee Retirement Income Security

Act of 1974, 29 U.S.C. §§ 1100-1145 (ERISA), arising out of Defendant's decision to cease

paying her long-term disability (LTD) benefits as of December 9, 2002 on the ground that, after

that date, there was no existing medical information proving that she was totally disabled as

required by the Plan.

Presently before this Court for disposition are cross-motions for summary judgment.  For

---

[1]     Plaintiff initially brought this action against the Plan, her employer, PNC Financial
Services Group, Inc. ("PNC"), and Sedgwick CMS ("Sedgwick"), PNC's disability insurance
carrier.  However, PNC and Sedgwick moved for dismissal on the ground that only the Plan is a
proper party defendant and Plaintiff agreed.  Therefore, on February 12, 2009, an order was
entered (Docket No. 17) granting the motion and dismissing PNC and Sedgwick from the case.

the reasons that follow, the motion filed by the Defendant should be granted and the motion filed

by the Plaintiff should be denied.

Facts

Plaintiff worked as an Administrative Assistant II for PNC from her date of hire, October

11, 1988, until her first date of absence on January 21, 2002.  (AR0072, 98.)[2]  Her employment

was ultimately terminated on October 11, 2003.  (AR0098.)  Due to her employment with PNC,

Plaintiff participated in the Plan.

The Plan is a welfare benefits plan subject to ERISA and provides full-time, salaried

employees who are out of work for periods of longer than 90 days with up to 70% of their base

salary.  (Plan at 1; Allen Decl. ¶¶ 5-6.)[3]  The Plan is fully self-funded.  (Allen Decl. ¶¶ 5-7.)

Benefits pursuant to the Plan are paid out of a separate trust, pre-established by an actuary for

that purpose.  Id.  PNC holds no residual interest in the trust, but, rather, all monies in the trust

must be used at all times for the exclusive benefit of participants or beneficiaries.  Id.

The Plan designates PNC as the Plan Administrator.  (Plan at 4.)  The Plan vests

the Administrator with authority and discretion as follows:

PLAN ADMINISTRATOR

The Administrator shall be responsible for the Plan's compliance with all the
requirements of applicable provisions of the Employee Retirement Income
Security Act of 1974, as amended ("ERISA").  The Company shall be the Plan
Administrator and the "named fiduciary" under ERISA.  The Administrator shall
be vested with all the power, authority and discretion necessary to supervise and

---

[2]     A copy of the Administrative Record ("AR") comprises Defendant's Exhibit A (Docket
No. 27) in support of its motion for summary judgment.

[3]     The Plan is contained within the Administrative Record at AR0123-45.  Kerry Allen's
declaration is contained within the Administrative Record at AR0192-93.

control the operation of the Plan in accordance with the terms thereof.

(Plan at 15-16.)  The Plan provides further that no decision by the Administrator shall be

overturned unless the decision is "arbitrary and capricious."  (Plan at 16.)

Section V(3)(a)(6) of the Plan expressly permits PNC "to appoint or employ individuals

or firms to assist in the administration of the Plan and any other agent it deems advisable."  (Plan

at 16.)  In accordance with this section, PNC and Sedgwick entered into a Services Agreement

("Administrative Services Agreement"),[4] pursuant to which PNC authorized Sedgwick to make

claims determinations under the Plan.  The Administrative Services Agreement explicitly confers

discretion on Sedgwick to evaluate and decide claims, and to review and resolve any appeal of a

denied claim.  (Administrative Services Agreement, Attach. B.)

Neither Sedgwick nor PNC obtain any direct financial benefit, nor have any pecuniary

interest if a claim is approved or denied, or in the ultimate decision rendered concerning

Plaintiff's claim for LTD benefits.  Sedgwick is paid the same amount for reviewing any claim,

whether it determines to grant or deny benefits.  (Allen Decl. ¶¶ 5-6.)

Section 5 of the Plan requires that a Participant notify the Benefits Department within 30

days of the date Total Disability starts, if possible; or, if not possible, no later than 120 days of

the date Total Disability starts.  (Plan at 16.)  Further, Section 7 of the Plan sets forth a detailed

claims procedure, with its own statute of limitations that governs claims for severance.  (Id. at

17.)  Specifically, the Plan provides, in relevant part:

> Claim for Benefits. Any claim for benefits under the Plan must be filed with the
> Claims Administrator not later than 90 days following the date Total Disability

---

[4]      A true and accurate copy of the Administrative Services Agreement is contained within
the Administrative Record at AR0146-73.

begins.

****

Exhaustion of Remedies. No legal action with respect to a claim for benefits under the Plan shall be instituted unless the claimant shall have first exhausted the claims and appeals procedures set forth in Sections 5 and 7 herein.

Notwithstanding the preceding, if a Participant fails to file a claim or request for review in the form and within the time frame specified herein, such claim or request shall be waived, and, the Participant will be forever barred from reasserting such claim.

Id.

Under the Plan, the terms "Total Disability" and "Totally Disabled" mean that, during an initial 90-day Elimination Period and the next 24 months of Total Disability, the Employee "cannot perform each of the material duties of his or her regular occupation" because of injury or sickness, and "requires the regular attendance of a physician." (Plan at 5.)[5] The Plan limits LTD benefits paid due to a mental illness to 24 months of Monthly Total Disability Benefit payments, unless the Participant had a mental illness; was confined in a hospital or institution; and was Totally Disabled as a result of that mental illness at the end of the 24 month period, as the Plan required. (Id. at 13.)[6]

LTD benefits cease on the earliest of, for example, the date Total Disability ceases, the date the Participant fails to provide proof of Total Disability and the date the employee ceases

---

[5]     After 24 months, the "any gainful" section of the Plan governs a claim for benefits. (Plan at 5.) To be eligible under that section, the employee is required to demonstrate that he or she cannot physically perform each of the material duties of any gainful occupation for which he or she is reasonably fitted by training, education or experience. Id.

[6]     Even in the event that a participant meets these requirements for Total Disability as a result of the mental illness at the end of the 24-month period, benefits will not be paid for a period longer than 180 days from the expiration of the 24 month period. (Plan at 13.)

4

employment.  (Plan at 10, 14.)  It is the employee's responsibility to submit documents and

information that establish that he or she is Totally Disabled and, thus, entitled to LTD benefits.

Id.

Up until January 21, 2002 , Plaintiff reported to work as an Administrative

Assistant II for PNC.  (AR0072, 98.)  In this position, Plaintiff's self-described duties included

"answer[ing] phones, handl[ing] all aspects of sport/entertainment tickets, deliver[ing] said

tickets to various buildings, distribut[ing] mail, maintain[ing] databases, filing " (AR0184-86.)

Defendant states that Plaintiff worked in a sedentary position, with no physical demands.

(AR0031,174, 180-83.)  Plaintiff responds that her injury was aggravated by the required sitting

and tasks that she had to complete.  (AR0052, 0072.)

On or about June 4, 2007, almost five and one-half (5½) years after Plaintiff's last day of

work at PNC, she submitted an Application For Benefits, dated May 22, 2007.  (AR0097, 175.)

In connection with her Application, Plaintiff alleged that her disability was "degenerative disc

disease of cervical spine," and that she could not perform her job because "neck and back pain,

side effects of medication, cannot do prolonged sitting or standing."  (AR0071, 73-74, 184-86.)

Plaintiff stated that she first noticed these symptoms in September 2001.  (AR0184.)  According

to Plaintiff, she applied for disability benefits as a result of "falling on [her] steps" in March

2001.  Id.  Plaintiff stated that she had surgery on June 12, 2002 to address her symptoms.  Id.

Defendant notes that, on her application, Plaintiff stated that her only restrictions, per her

doctor, were "no lifting, no driving for 1 mo[nth]."  (AR0184-86.)  Plaintiff observes that no date

or other context is provided that would indicate when she received this directive.

In connection with her Application, Plaintiff's treating physician, Dr. Robert H. Potter,

submitted a Treating Physician's Statement dated May 21, 2007.  (AR0189-91.)[7]  Dr. Potter

diagnosed Plaintiff with degenerative disc disease of the cervical spine.  Id.  Dr. Potter listed

Plaintiff's treatment as weekly chiropractics, prescription medications and nerve blocks as

needed.  Id.  Dr. Potter noted that Plaintiff "has been stable for many months and is not likely to

change or significantly improve."  (AR0191.)  He indicated that "neck and back pain" limited her

from performing the essential functions of her job.  Id.  He also indicated that her condition was

"unchanged" (rather than "recovered" or "improved") and that she had reached her maximum

medical improvement.  (AR0190.)  Finally, he indicated that she was "never" released back to

work and that she was not released back to work without restriction/limitation.  (AR0191.)

By letter dated June 6, 2007, Sedgwick contacted Plaintiff to acknowledge receipt of her

application for LTD benefits.  (AR0098.)  Although it is Plaintiff's duty to submit medical

documents and other information in support of her claim for LTD benefits under the Plan,

Sedgwick contacted Plaintiff and Plaintiff's physicians, Drs. Robert Potter, Brian Cicuto[8] and

Donald Whiting, on or about June 15, 2007, seeking additional information in support of

Plaintiff's LTD claim.  (AR0099.)  Sedgwick followed up on the status of Plaintiff's medical

records several times thereafter.  (AR0099-100.)

Over two months later, on or about August 14, 2007, Plaintiff's counsel, Greg Paul,

forwarded a copy of a the Social Security Administration's ("SSA's") Notice of Award of

---

[7]     Plaintiff contends that this statement is not included in the Administrative Record and
attaches it as Exhibit 1 to her brief (Docket No. 29 at 9 & n.1.)  However, as noted, it is included
in the Administrative Record at AR0189-91.

[8]     Defendant notes that Dr. Cicuto's office indicated to Sedgwick that he was no longer with
the practice and no records were provided.

Supplemental Security Income ("SSI"), which simply noted that SSI had been awarded and listed the amount of the monthly income.  (AR0042-49.)  A copy of the SSA's supporting decision was not included with the Notice.  Defendant states that it is unclear what information and criteria the SSA based its decision on, or had before it when deciding whether to award SSI to Plaintiff.  She responds that there is particularized information and criteria listed by the SSA regarding what terms the decision was based on.  (AR0041.)

In addition, Mr. Paul sent to Sedgwick: (1) a mental health opinion from Richard Withers, Licensed Psychologist, dated March 14, 2003; (2) a letter from Dr. Potter to Mr. Paul, with accompanying disability form and treatment note, dated December 9, 2002; (3) an initial psychiatric evaluation, dated November 26, 2002; and (4) a psychiatric pharmacotherapy visit note, dated December 23, 2002.  (AR0050-70.)  Defendant contends that, other than the aforementioned four documents, Plaintiff (and/or her counsel and physicians) did not submit any further medical documents or information in support of her claim to LTD benefits.

Defendant argues that none of the medical records that Plaintiff's attorney provided to Sedgwick evidence that Plaintiff was unable to perform all of the material duties of her job as an Administrative Assistant II.  (AR0050-70.)  It contends that Dr. Potter, whose listed specialty is "Family Medicine," only examined Plaintiff on one occasion--December 9, 2002.  (AR0052-56.)  On December 9, 2002, Dr. Potter stated that Plaintiff currently had "symptoms primarily revolving around her back"; mainly, chronic pain between the shoulder blades.  He noted, however, that Plaintiff had surgery in June 2002 for nerve impingement syndrome "which did result in some resolution of those symptoms" and that she "recovered well."  Dr. Potter further noted that Plaintiff is "currently not in distress," "is able to get on and off the exam table without

difficulty. . . . [and] can arise from a chair sitting feet flat on the floor without having to use her hands for assistance." Id.

Defendant further contends that Dr. Potter did not list any restrictions or limitations for Plaintiff that would prevent her from performing all of the material duties of her Administrative Assistant II position. (AR0052-56.)  Rather, Dr. Potter stated that Plaintiff could sit for 2 to 6 hours, stand for up to 2 hours, and could see, hear and speak without limitation.  Moreover, although she had decreased grip strength in her right hand (but not in her left hand), Plaintiff was unlimited in dexterity, and, notably, had no trouble holding a cigarette, smoking at least one pack of cigarettes per day.  (AR0065.)  Thus, Defendant concludes, there is nothing in Dr. Potter's examination report that suggests that Plaintiff was Totally Disabled as defined under the Plan.

Plaintiff responds that Dr. Potter said in his December 9, 2002 letter that he "believe[d] that she is unable to work in her current functional status and prognosis for improvement is poor. She he has been at this level of function for at least a year now, this is because she is unable to sit for more than a few minutes, she can not use her hands . . . She could not concentrate on work tasks for more than a few minutes at a time, which obviously greatly limits her ability to function in a work environment."  (AR0053.)  Dr. Potter also established that she was restricted in her abilities to stand and walk, less than two hours, and sit, two to less than six hours.  (AR0054.) Plaintiff contends that Defendant, in referring to Dr. Potter's office notes, takes things out of context.  For example, Dr. Potter says that Plaintiff "recovered well" from the January 2002 surgery, not the June 2002 operation.  (AR0056.)   Also, Defendant quotes Dr. Potter, saying that she was "currently not in distress," in relation to physical pain and mounting and dismounting an exam table.   However, in the office notes, the said quote is in regard to mental status and

8

orientation. "Alert white female, currently not in distress. She is oriented to person, place and time, her response to questions are appropriate." Id.

Further, Dr. Potter did state his belief that Plaintiff was incapable of working and that her prognosis was poor.  He noted that she could stand for less than two hours, and that she could sit for two to less than six hours. Dr. Potter also noted that Plaintiff was limited in her upper extremities, particularly her right hand, and limited in her reaching and handling abilities.  He also mentioned that the prescriptions she was taking could affect her mental capacity, which would also impede her ability to function and work normally. (AR0052-56.)  Plaintiff notes that each reference is a restriction or limitation.

Defendant contends that, according to Mr, Withers's psychological (not psychiatric) opinion, dated March 14, 2003, Plaintiff had a "mood disorder due to a general medical condition."  (AR0050-51.)  Although Mr. Withers noted that Plaintiff had "concentration and memory problems" and "distractability secondary to chronic pain," his opinion appears to be based upon Plaintiff's self-reports and not objective or recognizable testing.  In any event, Mr. Withers stated that Plaintiff could: understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without undue distraction; make simple work related decisions; ask simple questions or ask for assistance; accept instructions and respond appropriately to criticism; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in routine work settings; be aware of normal hazards and take appropriate precautions; set realistic goals or make plans independently; deal with stress of semiskilled and skilled work; interact appropriately with

the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and use public transportation.  Defendant thus concludes that, Mr. Withers's opinion concerning Plaintiff is devoid of any objective or other indication that Plaintiff was completely disabled from performing her own occupation.

Plaintiff responds that Dr. Withers's assessment of her, from a psychological point of view, is very telling of her limited mental capacity and ability to comprehend and process work-related information.  He references her mood disorder, her chronic pain leading to distractibility, her poor performance rates regarding work-related tasks, and the likelihood of her missing excessive amount of work due to impairments or treatments.  (AR0050-51.)

Defendant notes that Plaintiff's initial psychiatric evaluation, dated November 26, 2002, did not demonstrate that she was Totally Disabled from her Administrative Assistant II position with PNC.  (AR0057-69.)  Specifically, the initial psychiatric evaluation, completed by an unknown clinician, indicated that Plaintiff simply complained of a "depressed" mood. (AR0066.)  However, the remainder of the evaluation evidenced that Plaintiff suffered no cognitive deficits.  (AR0065-68.)  Specifically, the evaluation noted the following: Plaintiff's appearance was appropriate for the situation and behavior was unremarkable; rapport was easily established and maintained; eye contact was good; Plaintiff's speech was normal in rate, volume, articulation and prosody; suicidal and homicidal ideation were denied; thoughts were logical, coherent and focused on the content of the interview; patient was oriented to person, place, time and situation; there was no evidence of psychosis; reality testing was intact; IQ was average; judgment and insight were good; and stressors were moderate.  Id.  Plaintiff's records and pharmacotherapy visit evidenced that she was taking medication that controlled her

alleged symptoms, including Wellbutrin, Celebrex, Robaxin and Darvocet.  (AR0063.)

Defendant notes that, although Sedgwick provided Plaintiff with ample opportunity to submit medical evidence in support of her claim, it nonetheless reached out to Plaintiff's counsel on three more occasions to request evidence that demonstrated that Plaintiff was Totally Disabled from performing the material duties of her own occupation.  (AR0101.)  However, Plaintiff failed to submit any further evidence to support her claim for LTD benefits.  Accordingly, based on the evidence that Plaintiff submitted, Sedgwick denied Plaintiff's claim for LTD benefits on or about December 19, 2007.[9]  (AR0001-04.)  Sedgwick informed Plaintiff's counsel of the basis for its denial of her claim, stating as follows:

> The medical information in Ms. Ketterman's file is a progress note from Dr. Robert Potter Jr. dated December 9, 2002. The progress note indicates that Ms. Ketterman underwent microdisectomy surgery of C6 and C7 and that she complained of back pain from her shoulder blades to the lumbar area.
>
> On October 9, 2007 a call was placed to you to discuss the outstanding medical information. At this time you were not available so a voicemail was left for a return call. A second call was made to you on November 6, 2007 at which time you advised us that the assistant that handles the medical request was not in the office, however you would return the call with a status update once she returns. Ms. Ketterman's employment was terminated effective October 11, 2003.
>
> We have not been provided with clinical evidence that Ms. Ketterman was totally disabled and under the care of a physician as quoted in the above plan provisions from [January] 21, 2002, her first date of absence through her termination date of October 11, 2003, which would support the inability to perform the material duties of her own occupation. As such, Ms. Ketterman does not meet the definition of Total Disability and her claim for Long Term Disability benefits will be denied and closed accordingly.
>
> If you disagree with our determination and want to appeal this claim decision, you must submit a written appeal.

---

[9]   Sedgwick issued a corrected and final letter denial to Plaintiff on January 17, 2008 (AR0005-08).

11

(AR0002.)

 Plaintiff appealed the denial of her LTD benefit claim via a letter from her counsel, dated January 8, 2008.  (AR0009-10.)  On or about March 18, 19 and 26, 2008, Sedgwick acknowledged Plaintiff's appeal, by phone and letter, and sent a copy of the Administrative Record to her.  (AR0018-20.)

Plaintiff requested an additional thirty (30) days within which to submit supplemental medical information in support of her appeal.  (AR0021.)  By phone and a letter to Plaintiff, dated April 1, 2008, Sedgwick agreed to delay its review of Plaintiff's appeal and informed Plaintiff that she should provide any additional information by April 29, 2008.  Id.  Thereafter, Plaintiff again requested an additional thirty (30) days within which to submit information in support of her appeal for LTD benefits.  (AR0026.)  By letter dated April 15, 2008, Sedgwick agreed, yet again, to delay its review of Plaintiff's appeal and informed Plaintiff that she had to provide any additional information by May 30, 2008.  (AR0027.)

On May 23 and 29, 2008, Sedgwick called Plaintiff's counsel to remind him of the May 30, 2008 deadline to submit additional medical documents and information in support of Plaintiff's appeal for LTD benefits, although it had absolutely no obligation to do so. (AR0107-22.)  Further, Sedgwick asked Plaintiff's counsel to call and advise it if Plaintiff needed additional time to submit medical documents and information in support of her appeal. Id.  Sedgwick, however, did not hear back from Plaintiff or her counsel.

Consequently, Sedgwick had three independent physicians–Dr. Richard A. Silver, a board certified orthopedic surgeon; Dr. Howard Grattan, board certified in physical medicine and rehabilitation; and Dr. Robert N. Polsky, a board certified psychiatrist and neurologist–review all

of Plaintiff's medical information, including documentation from Plaintiff, Dr. Potter and Mr.
Withers.  (AR0080-96.)  After thoroughly reviewing Plaintiff's medical and other information
submitted in support of her claim for LTD benefits, both Drs. Silver and Grattan conferred with
Dr. Potter regarding whether Plaintiff was Totally Disabled or unable to perform her job as an
Administrative Assistant II.  Id.

Specifically, Dr. Silver spoke with Dr. Potter on June 9, 2008.  (AR0081.)  Dr. Potter
explicitly noted that Plaintiff was not "undergoing psychological and/or psychiatric care," and
that her "only medical problem is elevated cholesterol."  Id.  He also stated that Plaintiff had a
"loss of range of motion when she attempted to turn her head to the left, but she had full range of
motion of both upper extremities and she had no focal neurological deficits."  Id.  Based upon his
call with Dr. Potter as well as his review of Plaintiff's records, Dr. Silver opined on June 11,
2008 that, although Plaintiff was incapable of employment from January 21, 2002 through
December 9, 2002, "[t]here is no medical information available to support disability beyond this
date to present."  (AR0082.)

Similarly, Dr. Grattan spoke with Dr. Potter on June 5, 2008.  (AR0085.)  Dr. Potter
stated to Dr. Grattan that, "[p]reviously, she had had a neck surgery and she had done well with
that surgery, but now is coming back with more neck pain."  "He did not recall any hand
weakness or decreased abilities with hands or any neurologic weakness of the upper or lower
extremities."  Id.  "When asked about her working status, he stated he was not sure if she was
working currently or not, but did not know of any specific diagnosis or condition that would
restrict her from full fine motor tasks of upper extremities."  Id.  Plaintiff notes that Dr. Potter
also told Dr. Grattan "that the patient had a significant amount of pain that she felt was

disabling."  (AR0085.)

Based upon his call with Dr. Potter, and review of Plaintiff's documentation, Dr. Grattan noted that there was a lack of neurological, neuropsychological, self-report, MRI, EMG and similar testing or results.  (AR0093-95.)  In addition, Dr. Grattan stated that there were no complications from Plaintiff's surgery and that, consequently, Plaintiff should be able to safely return to sedentary duty two weeks after her surgery, with standard ergonomic considerations in the work environment.  Id.  Ultimately, Dr. Grattan concluded that Plaintiff was disabled from January 21, 2002 to February 2, 2002, but that there was "no objective clinical information to support disability beyond [February 3, 2002] ... as [there] has been no documentation of neurologic injury, limb loss, or cognitive impairment that would prevent use of bilateral upper extremities and ambulation."  (AR0094.)

Dr. Polsky concluded that Plaintiff was not disabled due to a diagnosis of depression. (AR0089.)  Specifically, Dr. Polsky stated that "the available clinical documentation does not demonstrate the employee to be disabled from the ability to perform her regular unrestricted occupational duties as of 01/21/02 to the present."  Id   He based his opinion on the fact that Plaintiff's documentation did not demonstrate impairments of memory, cognition, or concentration, but rather "[t]houghts were logical, coherent and focused," and "[i]ntellectual functioning was normal and judgment and insight were good."  (AR0088.)  Dr. Polsky noted that he attempted to conduct a teleconference with Dr. Potter on June 6, 2008 and June 9, 2008 (indicating a need for a call back by June 10, 2008), but Dr. Potter did not call him back.  Id.

Defendant concludes that neither Plaintiff's own physician nor the independent physician advisors who reviewed her medical information concluded that Plaintiff was completely disabled

from performing her occupation as an Administrative Assistant after December 9, 2002.  For this

reason, in a letter dated June 23, 2008, Sedgwick upheld the prior denial of Plaintiff's claim for

LTD benefits after December 9, 2002.  (AR0028-31.)  However, Sedgwick partially overturned

its prior decision to the extent that it refused Plaintiff benefits prior to December 9, 2002,

concluding that she was entitled to benefits from January 21, 2002 up to and including December

9, 2002.  Id.

      Plaintiff responds that Dr. Potter said on December 9, 2002 that she "is unable to work in

her current functional status and prognosis for improvement is poor." (AR0053.)  If she is

entirely unable to work, Plaintiff is completely disabled for purposes of the Plan.  Additionally,

Dr. Potter established on May 21, 2007 that Plaintiff's condition is "unchanged," rather than

"improved" or "recovered."  He established that she had reached maximum medical

improvement.  (AR0190.)  Finally, and most notably, Dr. Potter established that Plaintiff was

still under his care and that she was "never" released to work, neither full nor part time.

(AR0191.)

      In its final denial letter, Sedgwick stated that, "[a]lthough some findings were referenced,

none are documented to be so severe as to prevent [you] from performing the essential functions

of [your] regular occupation of Administrative Assistant II from December 10, 2002 through

October 11, 2003."  (AR0031.) Sedgwick then informed Plaintiff that "all appellate

administrative remedies have been exhausted," and "[n]o further information will be reviewed or

considered for this claim, as the administrative record is now closed."  Id.  It also informed

Plaintiff' counsel of its decision on June 23, 2008, and sent a copy of the updated Administrative

Record to him on July 22, 2008.  (AR0039, 119.)

Plaintiff's counsel states that he did not receive the most thorough, updated version of the Administrative Record until after June 29, 2009, the day the brief in support of a motion for summary judgment was due.

Procedural History

Plaintiff filed this action on November 5, 2008.  She alleges that Defendant acted arbitrarily and capriciously when it terminated her disability benefits, in violation of 29 U.S.C. § 1132(a)(1)(B).

On June 30, 2009, the parties filed cross-motions for summary judgment.

Standard of Review

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-

moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Defendant argues that: 1) Plaintiff cannot maintain her claim because she did not submit a claim for benefits in a timely manner, as the Plan requires; and 2) Plaintiff has not demonstrated that the administrator acted arbitrarily and capriciously and therefore the decision denying her benefits should not be reversed.

Plaintiff responds that: 1) Defendant accepted her application for LTD and approved benefits through December 9, 2002 without ever raising the argument that her application was untimely, so it cannot raise this issue now; and 2) the reversal of payment of "own occupation" benefits is subject to scrutiny because the Plan definition of disability did not change and her medical condition did not improve, as evidenced by her being approved for SSI benefits.

Timeliness of claim

Defendant argues that Plaintiff cannot maintain her claim because she did not submit it to Sedgwick within 90 days of the date Total Disability began, as required by the Plan (AR0141).  It notes that the Plan required her to notify the Benefits Department within 30 days of the date Total Disability started, if possible, or if not possible, no later than 120 days after Total Disability started (AR0140).  The Plan states that, if an employee fails to submit a timely claim, "such claim or request shall be waived, and the Participant will be forever barred from reasserting" and "institut[ing]" "legal action" with respect to such claim.  (AR0141.)

Under ERISA section 503, employee benefit plans must "provide adequate notice in writing" of a claim denial "setting forth the specific reasons for such denial."  29 U.S.C.

17

§ 1133(1); 29 C.F.R. § 2560.503-1(g).  See also Black & Decker Disability Plan v. Nord, 538

U.S. 822, 825 (2003).  Although Plaintiff received notice in writing, no mention was made of any

timeliness issue.  Thus, the argument that Plaintiff did not submit her claim in a timely fashion

constitutes a post hoc rationale.

> The Court of Appeals has noted
>
> our agreement with the policy concerns identified in University Hospitals of Cleveland v. Emerson Electric Co., 202 F.3d 839 (6th Cir. 2000), where the court held that it would not defer to post hoc rationales for denying benefits claims generated for the purpose of litigation by ERISA plan administrators when those rationales did not appear in the denial letters sent to the benefits claimants or in the administrative record. The court observed that:
>
>> it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review.... To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them-or, worse yet, federal judges-to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 177 n.8 (3d Cir. 2001) (quoting

Emerson, 202 F.3d at 848 n.7).  Thus, Defendant may not rely on the post-hoc rationale that

Plaintiff's claim was submitted in an untimely fashion.[10]

---

[10]      In addition, Defendant could not simply argue that the claim was untimely in any event, but would have to demonstrate that it was prejudiced by the untimely submission.  See UNUM Life Ins. Co. v. Ward, 526 U.S. 358 (1999); Foley v. International Bhd. Elec. Workers Local Union 98 Pa. Pension Fund, 91 F. Supp. 2d 797, 803 n.6 (E.D. Pa. 2000) (Pennsylvania law requires ERISA-covered plan to show it was prejudiced by untimely claim application, according to Ward).  It has not done so.

ERISA claims standard of review

ERISA section 502(a)(1)(B) provides that a civil action may be brought:

(1) by a participant or beneficiary–

.  .  .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

29 U.S.C. § 1132(a).  In 1989, the Supreme Court resolved a conflict among the courts of appeals as to the appropriate standard of review in actions brought under § 1132(a)(1)(B) to review a denial of benefits:

[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of the terms in the plan at issue.  Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  When the plan gives the administrator discretionary authority, the court should apply an "arbitrary and capricious" standard of review, and the decision "will be overturned only if it is 'clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan.'" Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000) (quoting Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 41 (3d Cir. 1993)).

In Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000), the Court of Appeals held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious

19

standard of review." Id. at 378.  In addition, the court has held that an employer-fiduciary may be subject to a conflict of interest requiring heightened scrutiny when its plan is "unfunded," that is, when it pays benefits out of operating funds rather than from a separate ERISA trust account. Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 197-98 (3d Cir. 2002).  Finally, the court has noted other circumstances in which a heightened standard of review will be appropriate.  For example, when an administrator has "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits," a heightened standard of review may be triggered.  Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004).

Recently, however, the Supreme Court held that courts should continue to apply a deferential abuse-of-discretion standard of review in cases where a conflict is present, but that courts should take the conflict into account not in formulating the standard of review, but in determining whether the administrator or fiduciary abused its discretion:

> We do not believe that Firestone's statement implies a change in the standard of review, say, from deferential to de novo review.  Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion.  We see no reason to forsake Firestone's reliance upon trust law in this respect.

Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2350 (2008) (citations omitted).  The Court held that it was not "necessary or desirable" for courts to create special procedural, evidentiary, or burden-of-proof rules to account for conflicts of interest, and that "conflicts are but one factor among many that a reviewing judge must take into account."  Id. at 2351.

The Court of Appeals has now indicated that:

Accordingly, we find that, in light of Glenn, our "sliding scale" approach is no longer valid.  Instead, courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.

Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009) (citations omitted).

See also Doroshow v. Hartford Life and Accident Ins. Co., 2009 WL 2257384, at*3 (3d Cir. July 30, 2009).[11]

As noted above, the Plan is fully self-funded.  (Allen Decl. ¶¶ 5-7.)  Benefits pursuant to the Plan are paid out of a separate trust, pre-established by an actuary for that purpose.  Id.  PNC holds no residual interest in the trust, but, rather, all monies in the trust must be used at all times for the exclusive benefit of participants or beneficiaries.  Id.  The Plan vests the Administrator with authority and discretion and provides that no decision by the Administrator shall be overturned unless the decision is "arbitrary and capricious."  (Plan at 15-16.)  Finally, neither PNC nor Sedgwick (appointed by PNC to evaluate and decide claims under an Administrative Services Agreement) obtains any direct financial benefit, nor has any pecuniary interest if a claim is approved or denied, or in the ultimate decision rendered concerning Plaintiff's claim for LTD benefits.  (Allen Decl. ¶¶ 5-6.)  Sedgwick is paid the same amount for reviewing any claim, whether it determines to grant or deny benefits.  Id.

Thus, this case does not present a conflict of interest.  Plaintiff contends that procedural irregularities exist, citing the Defendant's "reversal of position without additional medical

---

[11]     Neither party cites Glenn or Estate of Schwing.  Nevertheless, this Court is bound to follow the law as articulated by the Supreme Court and Court of Appeals for the Third Circuit.

evidence" and failure to consider the award of SSI after requiring Plaintiff to apply for it to offset benefits. However, she has not demonstrated that either of these factors applies in this case.

First, Defendant did not "reverse" its position. Rather, LTD benefits were awarded through December 9, 2002 because medical evidence was presented to support them through that date. Plaintiff presented no evidence to support the payment of LTD benefits after December 9, 2002. Dr. Potter's statement dated May 21, 2007 does not indicate when he most recently treated Plaintiff and cites no medical evidence post-dating the evidence referenced in 2002. Moreover, even after Sedgwick provided Plaintiff and her counsel with numerous opportunities to supplement the record with medical evidence, they failed to do so.

Plaintiff notes that Dr. Silver stated in his report that Dr. Potter indicated that he saw her on February 4, 2008 and he continued to believe that she was incapable of gainful employment due to her loss of range of motion, including sedentary work (AR0081, 83). However, no treatment notes from Dr. Potter were submitted to substantiate this visit. Dr. Silver repeatedly stated that "detailed medical records are unavailable for this clinician to review" and that "there is no medical information available to support disability beyond the date of 12/09/02 to present." (AR0083.)

Second, although Plaintiff forwarded Sedgwick a copy of the Notice of Award indicating that she had been awarded SSI on July 25, 2003 (AR0046), she did not send Sedgwick a copy of the decision itself or any medical evidence that may have been considered by the SSA in determining her eligibility. See Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7th Cir. 1994) (MetLife did not have the SSA file before it and it was bound to consider only the evidence presented), disapproved of on other grounds, Diaz v. Prudential Ins. Co. of America,

424 F.3d 635 (7th Cir. 2005).

Plaintiff cites Porter v. Broadspire, 492 F. Supp. 2d 480 (W.D. Pa. 2007).  In that case, Broadspire (the claims administrator for the Comcast LTD Plan) found the plaintiff to be disabled but subsequently concluded that she was no longer eligible for LTD benefits after July 30, 2004.  Judge Ambrose determined, inter alia, that, because the Plan required all participants to apply for SSI and supply the administrator with a copy of the determination and because the letter determining that the plaintiff was no longer eligible for LTD benefits did not reference her award of SSI, Broadspire "essentially found the social security award to be irrelevant" and "this anomaly supports increasing the degree of scrutiny."  Id. at 487.  She concluded that the administrator acted arbitrarily and capriciously based on the following factors: 1) the record was undisputed that the plaintiff suffered from relapsing remitting multiple sclerosis and that she presented "objective clinical findings" which included MRIs and doctors' notes indicating a progression of the disease; 2) Broadspire improperly inferred that the plaintiff was capable of sedentary work because she completed the questionnaire and worked out on an exercise machine; 3) Broadspire erred by requiring "objective evidence" that the plaintiff's condition had worsened when the plan contained no such requirement and the record contained such evidence in any event (Broadspire only concluded otherwise by crediting one portion of a report and rejecting another); 4) Broadspire relied on a biased vocational assessment; and 5) Broadspire essentially found the social security award to be irrelevant.

Here, by contrast, the record contained no medical evidence supporting the award of LTD benefits after December 9, 2002, Sedgwick did not contend that Plaintiff had to submit anything other than what the Plan required, and no improper inferences were drawn against her.  The only

element in common between this case and Porter is that no reference was made to Plaintiff's award of SSI. This factor alone, however, is insufficient to demonstrate that Defendant abused its discretion or that it acted arbitrarily and capriciously in concluding that she failed to demonstrate that she met the requirements for LTD after December 9, 2002.[12]

In applying the arbitrary and capricious standard of review, a court "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Orvosh, 222 F.3d at 129. Rather, the arbitrary and capricious standard is an "extremely deferential" one, allowing the Court to overturn a claim denial "only if it is clearly not supported by the evidence of record," or if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pinto, 214 F.3d at 393 (citations and internal quotations omitted); Orvosh, 222 F.3d at 129 (citations and internal quotations omitted).

Plaintiff bears the burden of proof that the claims administrator's decision to deny benefits was arbitrary and capricious. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439-40 (3d Cir. 1997). She has failed to demonstrate that her claim meets this test. Sedgwick not only allowed her ample opportunity to provide evidence to support her claim, but also had three independent physicians review the file and contact Dr. Potter, and it acknowledged their conclusion that she established a basis for disability at most until December 9, 2002 but not thereafter. Thus, the decision is the opposite of "arbitrary and capricious": it appears to be thorough and well-considered.

Plaintiff argues that Defendant failed to accord sufficient deference to the opinion of Dr.

---

[12]    In addition, the Porter case was decided prior to the Supreme Court's decision in Glenn, and neither the Supreme Court nor the Court of Appeals has ever held that a plan administrator is required to explain why it did not reach the same conclusion as to disability as the SSA.

Potter, her treating physician.  However, the Supreme Court has held that "plan administrators

are not obliged to accord special deference to the opinions of treating physicians."  Black &

Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003).  The Court further noted that:

> Plan administrators, of course, may not arbitrarily refuse to credit a
> claimant's reliable evidence, including the opinions of a treating physician.  But,
> we hold, courts have no warrant to require administrators automatically to accord
> special weight to the opinions of a claimant's physician; nor may courts impose
> on plan administrators a discrete burden of explanation when they credit reliable
> evidence that conflicts with a treating physician's evaluation.

Id. at 834 (footnote omitted).  See also Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250,

255-58 (3d Cir. 2004) (not arbitrary and capricious for administrator to have its own physicians

review plaintiff's medical information and to ultimately disagree with plaintiff's treating

physician's finding of disability).

Defendant did not arbitrarily dismiss Dr. Potter's opinion.  Rather, it required Plaintiff to

substantiate her disability with evidence, but concluded that she was unable to do so for the

period beginning after December 9, 2002.  As noted above, the issue was then presented to three

independent physicians, who reviewed the file and contacted Dr. Potter.  Ultimately, these

physicians concluded that she established a basis for disability until December 9, 2002 but not

thereafter.  Defendant relied on this conclusion and Plaintiff has failed to demonstrate that doing

so was arbitrary and capricious.

For these reasons, it is recommended that the motion for summary judgment submitted on

behalf of the defendant (Docket No. 24) be granted.  It is further recommended that the motion

for summary judgment submitted on behalf of the plaintiff (Docket No. 28) be denied.

Within the time specified in the Notice of Electronic Filing, any party may serve and file

written objections to this Report and Recommendation.  Any party opposing the objections shall

have seven (7) days from the date of service of objections to respond thereto.  Failure to file

timely objections may constitute a waiver of any appellate rights.

                                                      Respectfully submitted,


                                                      s/Robert C. Mitchell
                                                      ROBERT C. MITCHELL
                                                      United States Magistrate Judge

Dated: August 12, 2009